IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 20-cv-00617-DDD-KAS

CBD970, LLC, a Colorado Limited Liability Company, also known as CBD970.com, LLC.

      Plaintiff/Counter-Defendant,

v.

LABYRINTH HOLDINGS, INC., a Nevada corporation,
ROBERT HELLMAN, Individually;
JAMES HILL, Individually; and
LABYRINTH HOLDINGS LLC, a California limited liability company;

      Defendants/Counterclaimants/Third-Party Plaintiffs,

v.

KENNETH SACK, an individual and Colorado citizen;
ADAM AYERS, an individual and Colorado citizen;
EAGLE SPRINGS ORGANIC, LLC, a Colorado limited liability company; and
ORGANIC GROWERS LLC, a Colorado limited liability Company,

      Third-Party Defendants.

---

**ORDER**

---

**ENTERED BY MAGISTRATE JUDGE KATHRYN A. STARNELLA**

      This matter is before the Court on Plaintiff's **Motion for Sanctions Against Defendants for Failure to Comply with Memorandum of Understanding in Compliance with D.141, Including Certificate of Conferral** [#143] (the "Motion"). Defendants filed a Response [#149] in opposition to the Motion [#143], and Plaintiff filed a Reply [#150]. The Motion [#143] has been referred to the undersigned. *See Order Referring Motion* [#144].

Case No. 1:20-cv-00617-DDD-KAS    Document 179    filed 03/12/25    USDC Colorado
pg 2 of 25

The Court has reviewed the briefing, the case file, and the applicable law. For the following reasons, the Motion [#143] is **GRANTED IN PART**.[1] The Court finds that Plaintiff is entitled to an award of attorney fees arising from the breach of the parties' Memorandum of Understanding, but its claimed fees are grossly excessive. The Motion [#143] is **DENIED WITHOUT PREJUDICE** in all other respects related to the request for fees and costs. The Motion [#143] is **DENIED IN PART** to the extent it seeks payment of funds from the Court's Registry pursuant to the Memorandum of Understanding's "penalty" provision. The Court will order Plaintiff to submit an amended motion for attorney fees that addresses the deficiencies identified herein.[2]

## I. Background

Plaintiff's Motion [#143] focuses on the parties' litigation conduct, so the Court will briefly focus on the relevant procedural history rather than the substance of their claims. Plaintiff filed this lawsuit on March 4, 2020, alleging that Defendants breached and/or fraudulently induced it to enter a contract for a "unique and proprietary extraction

---

[1] As discussed herein, the Motion [#114] does not truly seek sanctions but rather seeks attorney fees pursuant to a fee-shifting contractual provision. Under Colorado law, attorney fees available by statute or as part of a substantive claim are treated as "damages" and are part of that claim, but "if attorney fees are sought based on a contractual agreement to shift fees to a prevailing party, they should be treated as costs, at least where the fee-shifting contractual provision is not the subject of the dispute between the parties and the contract is proved to exist." *Butler v. Lembeck*, 182 P.3d 1185, 1189 (Colo. App. 2007). The Court therefore proceeds by Order rather than Recommendation because in this context, a finding that Plaintiff is entitled to attorney fees is non-dispositive. *See, e.g.*, *Carbajal v. Lucio*, No. 10-cv-02862-PAB-KLM, 2016 WL 7228819, at *1 (D. Colo. Dec. 14, 2016) (sustaining objection to magistrate judge's order awarding attorney fees after reviewing it as non-dispositive, under "clearly erroneous or contrary to law" standard); *Seidman v. Am. Fam. Mut. Ins. Co.*, No. 14-cv-03193-WJM-KMT, 2016 WL 6518254, at *3-4 (D. Colo. Nov. 3, 2016) (adopting magistrate judge's order awarding attorney fees as discovery sanction after reviewing it as non-dispositive, under "plain error" standard).

[2] A nearly identical Order has been contemporaneously issued in the related case, *Rifle Onion Company LLC v. Hellman*, No. 20-cv-03514-DDD-KAS.

equipment" that could remove all the tetrahydrocannabinol ("THC") from Plaintiff's hemp crop so that these post-extraction products could be sold without violating state or federal law. *See Compl.* [#1], ¶¶ 29-30, 73-85. Defendants counterclaimed and alleged third-party claims against individuals and entities associated with Plaintiff, including breach of contract, negligent misrepresentation, fraud in the inducement, tortious interference with contract, and unjust enrichment. *See Answer, Counterclaims, & Third-Party Compl.* [#14] at 22-26, ¶¶ 69-101.

**A.    Early Litigation and First Mediation**

On August 29, 2022, the parties participated in mediation, which did not resolve the case, although the parties agreed in principle to a forensic audit of Defendants to determine whether any money was available and whether continued litigation was warranted. *See Pl.'s Motion to Extend Deadlines* [#84] at 2, ¶ 5 (describing mediation efforts); *Motion* [#143] at 2, ¶ 2 (similar). The parties disagreed over who would perform the forensic audit before ultimately deciding that Alvin C. Horton, C.P.A. ("Mr. Horton") would act as Auditor. *See Response* [#149] at 4-5.

**B.    Mr. Horton's Engagement**

On or around April 26, 2023, Defendants executed an Engagement Letter with Mr. Horton, engaging him to:

> determine whether Labyrinth Holdings LLC funds were improperly moved to evade creditors, syphon monies out of the company leaving the company improperly capitalized, has or should have assets and if not that the assets were properly disposed of and were arm's length transactions (or not), improperly placed liabilities onto their books, failed to record assets or values on the books, had possession or control of unreported assets, made improper distributions, had third parties or the defendant(s) personally take value(s) that should have gone to or remained in the company, improperly

caused damage or disposed of assets, or improperly diverted monies or assets.

*Engagement Letter* [#120-1][3] at 23; *see id.* at 25-26 (signatures and dates).

As part of their agreement with Mr. Horton, Defendants agreed to provide him "promptly, upon request," any information, financial or otherwise, that he deemed necessary to complete the audit. *Id.* at 23. Upon completion of the work, Mr. Horton would "prepare a condensed report" stating one of three things: (1) the audit was completed and no inconsistencies or improprieties were found; (2) the work was completed but Mr. Horton found inconsistencies or improprieties; or (3) Mr. Horton was unable to complete the audit. *Id.* at 24.

On July 3, 2023, the parties filed an "Agreed Motion to Stay Case" [#105], attaching executed counterparts of the Memorandum of Understanding (the "MOU"). *See* [#105-2] (Plaintiff's signed copy of the MOU); [#105-3] (Defendants' signed copy of the MOU). The Court stayed the case. *See Minute Order* [#107].

**C.    The Memorandum of Understanding [#105-2]**

In the MOU [#105-2], the parties "acknowledge that much of this case pivots upon the underlying finances centered in this litigation" and state their agreement "to retain a forensic CPA to conduct an audit of the Defendant(s) in conformity with the scope outlined in the [Engagement Letter.]" *MOU* [#105-2] at 2, § II. The parties confirmed that the Engagement Letter would "sufficiently speak to the terms of the audit" but "further agree[d]

---

[3] For clarity, in this Order, the Court cites to the first filed versions of the Engagement Letter [#120-1], the Memorandum of Understanding [#105-2], and Mr. Horton's Non-Compliance Letter [#120-2] rather than the versions filed as Exhibits 1 and 2 [#143-1, #143-2] to the current Motion, which have been re-filed so often that the court-stamped page and document numbers at the top of each page are completely illegible.

that . . . [i]n the event that the Auditor still cannot obtain the requested documents and deems them to be needed, he shall inform by email all Parties [sic] counsel and if warranted halt or stop the audit." *Id.* at 3, § IV.3. Additionally, "[a]ny material delay to Mr. Horton's services due to unpaid fees or failing to produce requested documents shall be deemed a material breach of this MOU." *Id.* at 4, § IV.9. Defendants agreed to pay $10,000 into trust (either to the Clerk of Court or to either party's attorney's trust account) "should the auditor's report find that he could not properly complete the Audit." *Id.*, § IV.13. Plaintiff (and the plaintiff in the companion case) retained the right "to file an appropriate motion before the court seeking compliance, terminating the Audit, seeking specific performance, as well as seeking that the $10,000.00 placed in escrow pursuant to the terms of this paragraph so that they shall be forthwith paid over to [Plaintiffs in both cases and their counsel]. [Defendants] agree not to challenge this tendering and release of funds in the event of such a breach if represented by the auditor." *Id.*

The MOU also contained two provisions regarding attorney fees. First, "[i]n the event that either party breaches this MOU and the spirit thereof, the party alleging breach or non-compliance may bring forth a Sanctions Motion, or other appropriate motion, against the other including an award of attorney fees and costs." *Id.* at 5, § IV.15. Additionally, "[i]n the event litigation arises out of or stemming from this Agreement, the Prevailing Party shall be entitled to an award of reasonable attorney fees and costs." *Id.* at 6, § V.G. The parties reaffirmed their understanding that "neither party(s) nor their lawyer(s) can control the Court, can control whether the Court grants the relief requested herein, or can control the outcome of any judicial decision, judicial request, or what an

5

order will say." *Id.* at 5, § V.A (emphasis omitted). The parties chose "The Federal Laws of the State of Colorado, USA" as the governing law. *Id.* at 6, § V.B.

**D.    Mr. Horton's Non-Compliance Letter**

On September 25, 2023, Mr. Horton wrote Defendants' counsel a Non-Compliance Letter [#120-2], which he also sent to Plaintiff's counsel. *See Non-Compliance Letter* [#120-2] at 3 (stating that "Mr. Brand is copied on this letter"). Mr. Horton stated that, although he had "received some initially supplied documents as early as May 8, 2023[,] from Mr. Archer," he had not received numerous documents from Defendants or from their counsel. *Id.* at 3-4. Without going into detail about what documents were withheld or not provided, Mr. Horton explained that he "had several phone calls with [Defendants' counsel], Mr. Hellman, and his CPA" in which he "explained [his] needs for these documents and the conversations of course opened up other doors for which [he] requested, orally, some additional [documents]." *Id.* at 4.

On July 1, 2023, Mr. Horton had "sent [Defendants' counsel] yet another request as there were many holes within the documents provided" and "Mr. Hellman and Mr. Archer informed [Mr. Horton] that they have the documents but need time to locate them." *Id.* However, as of the date of the Non-Compliance Letter, Mr. Horton was still waiting for those documents even though "[he] was assured that [Defendants' counsel's] clients were in fact in possession." *Id.*

On September 5, 2023, Mr. Horton "again sent an additional request for documents" that "focuse[d] on what would appear to be differences in how people might view the financial evidence and these differences needed to be cleared up[.]" *Id.* Again, he "spoke to Mr. Hellman and Mr. Archer several times about this production. Mr. Hellman

6

appeared to be hesitant about this production and stated that he would talk with [Defendants' counsel]. No production has been provided."

Ultimately, Mr. Horton decided to halt the audit after coming to three conclusions: (1) "nothing additional shall be produced to further this audit and its conclusion"; (2) "[t]he company's external CPA and Mr. Hellman appear to be in conflict"; and (3) "there is also a material conflict between what Mr. Hellman has told [Mr. Horton] vs. what is showing in some of the documents which were produced or which [Mr. Horton] obtained." *Id.* Mr. Horton felt that he was "being played so [Defendants] can buy time or waste it," so he "call[ed] the end to this process due to non-compliance." *Id.*

**E.    Subsequent History**

On December 8, 2023, Plaintiff (and the plaintiff in the companion case) moved to enforce the MOU, asking the Court to order Defendants to pay $10,000 as set forth in § IV.13, and seeking Defendants' specific performance of the Engagement Letter. *See Motion to Enforce* [#120] at 2. At a June 12, 2024 hearing, the Court granted in part the Motion to Enforce [#120] and ordered Defendants to deposit $10,000 (for this case and the companion case, No. 20-cv-03514-DDD-KAS) into the Court's Registry. *See Courtroom Minutes* [#141] at 1. The Court also ordered Plaintiff to file any motion for attorney fees and costs for non-compliance with the MOU. *Id.* Finally, the Court ordered the parties to complete the audit contemplated in the MOU, which it construed "as part of ongoing settlement efforts that began with [a] March 21, 2024 Settlement Conference [#127]." *Minute Order* [#142]. On July 2, 2024, Plaintiff filed the pending Motion [#143].

7

**F.    The Parties' Arguments**

Plaintiff requests sanctions against Defendants "for failure to comply with [the MOU]" and identifies the elements of breach of contract before asking the Court to impose sanctions for Defendants' alleged bad faith conduct pursuant to its inherent authority, as contemplated in *Chambers v. Nasco, Inc.*, 501 U.S. 32, 45-46 (1991). *See Motion* [#143] at 1, 5-7.

Defendants retort that Plaintiff "rel[ies] on the wrong legal standard" because it was "granted leave to file a motion for sanctions under F.R.C.P. 37(d) [but] the Motion inexplicably cites only to cases analyzing F.R.C.P. 11." *Response* [#149] at 6. They assert that "delays in providing information to Mr. Horton were not intentional, and were due largely to the non-existence of records at the time and an inability to articulate why the financial records provided to Mr. Horton contradicted oral representations made to him." *Id.* at 7. These issues, Defendants argue, were not the product of bad faith or intentional or fraudulent conduct, and they assert they are in "full compliance" with the Court's order to continue with the audit. *Id.* They further argue that Rule 37 sanctions are inappropriate because the alleged violation of the MOU was not a discovery violation sanctionable under that rule. *Id.* at 9-10.

In further opposition to a fee award, Defendants acknowledge that the MOU permits Plaintiff to move for attorney fees but argue that it does not require the Court to award them. *Id.* at 9-10. Finally, Defendants challenge the reasonableness of Plaintiff's attorney fees because they include "time entries with no rational relationship to the parties MOU or the [Defendants'] breaches of the same[.]" *Id.* at 12-13 (listing examples of unrelated line items).

8

In its Reply, Plaintiff clarifies that its Motion [#143] is based upon the Court's inherent power but proceeds to discuss the MOU provision that identifies an "additional remedy of filing a sanctions motion or other appropriate motion 'in the event that either party breaches this MOU and the spirit thereof.'" *Reply* [#150] at 2, 3 (distinguishing MOU [#105-2] § IV.13 from MOU § IV.15).

Both sides' arguments miss the point, perhaps because the MOU inaptly used the term "Sanctions Motion" to describe a fee-shifting provision. The Court is not considering sanctions against Defendants pursuant to its inherent authority or under the Federal Rules of Civil Procedure. Defendants correctly argue that Plaintiff has not made the requisite showing under Rule 11, Rule 37, or *Chambers*; rather, the Court is considering whether to assess attorney fees and a "penalty" fee pursuant to the MOU—which expressly provides for them in the event it is breached. *See, e.g.*, *Courtroom Minutes* [#141] at 1 (ordering Plaintiff to file a "Motion for Attorneys' Fees and Costs *as a Sanction for non-compliance with the MOU*"); *MOU* [#105-2] at 4-5, § IV.13 (contemplating $10,000 "penalty" for non-compliance due to auditor's inability to complete the audit), 5 § IV.15 (contemplating a "Sanctions Motion, or other appropriate motion, . . . including an award of attorney fees and costs" in the event of breach). At bottom, this is a question of contract interpretation, not whether Defendants engaged in conduct that the Court might otherwise find sanctionable.

## II. Legal Standards

### A.    Governing Law

At the outset, the Court notes that the MOU contains a choice-of-law clause providing that it will be governed by "[t]he Federal Laws of the State of Colorado, USA."

9

*See MOU* [#105-2] at 6, § V.B. On its face, this is ambiguous, as it suggests that the Court should apply both state and federal substantive law. Given the Supreme Court's reluctance to apply federal common law to private disputes, the Court presumes the parties intended to invoke Colorado substantive law and federal procedural law, as this Court routinely does in diversity cases. *See, e.g.*, *Miree v. DeKalb County, Ga.*, 433 U.S. 25, 29 (1977) (holding that state common law, rather than federal common law, governed the plaintiffs' breach of contract claim against the county because "only the rights of private litigants are at issue" and the claim's resolution will not affect the United States); *Hanna v. Plumer*, 380 U.S. 460, 465 (1965) (stating that "federal courts are to apply state substantive law and federal procedural law"). Moreover, the Court previously applied Colorado law to interpret the MOU's provisions. *See Order* [#168] at 8-10. The Court therefore applies Colorado substantive law and federal procedural law.

## B.    Contract Interpretation

Under Colorado law, contract interpretation is a question of law. *See, e.g.*, *Fed. Deposit Ins. Corp. v. Fisher*, 292 P.3d 934, 937 (Colo. 2013). When interpreting a contract, courts primarily seek "to determine and give effect to the intent of the parties." *CapitalValue Advisors, LLC v. K2D, Inc.*, 321 P.3d 602, 605 (Colo. App. 2013). To determine parties' intent, courts examine the contract's language; "[w]ritten contracts that are complete and free from ambiguity will be found to express the intention of the parties and will be enforced according to their plain language." *Id*. (quoting *Ad Two, Inc. v. City & County of Denver*, 9 P.3d 373, 376 (Colo. 2000)).

"A contract is ambiguous where it is reasonably susceptible of more than one meaning"; however, the parties' mere disagreement "concerning the meaning of terms

10

does not create an ambiguity." *Colo. Intergovernmental Risk Sharing Agency v. Northfield Ins. Co.*, 207 P.3d 839, 841 (Colo. App. 2008) (internal quotation marks and citation omitted). To determine "whether an ambiguity exists, the court may look to the meaning of words with 'reference to all contractual provisions and the nature of the transaction which forms the contract's subject matter.'" *Stroh Ranch Dev., LLC v. Cherry Creek S. Metro. Dist. No. 2*, 935 F. Supp. 2d 1053, 1060 (D. Colo. 2013) (quoting *In re Marriage of Thomason*, 802 P.2d 1189 (Colo. App. 1990); *May v. United States*, 756 P.2d 362, 369 (Colo. 1988) (*en banc*)).

"[C]ourts must *not* view clauses or phrases in isolation." *Stroh Ranch Dev.*, 935 F. Supp. 2d at 1060 (internal citation and quotation marks omitted) (emphasis in original). "When faced with conflicting provisions in a contract, a court should adopt, if possible, a reasonable interpretation of the contract that gives effect to all its provisions. When two clauses of a contract are in apparent conflict, the clause that gives effect to the primary purpose of the contract will control." *White River Vill., LLP v. Fid. and Deposit Co. of Md.*, Nos. 08-cv-00248-REB-BNB, 08-cv-00359-REB-BNB, 2009 WL 792728, at *3 (D. Colo. Mar. 23, 2009) (internal citations and modification omitted).

## C.    Contractual Attorney Fee Awards

Under Colorado law, contractual attorney fee provisions are generally enforceable. *See Klein v. Tiburon Dev. LLC*, 405 P.3d 470, 475 (Colo. App. 2017); *see also, e.g.*, *Brock v. Weidner*, 93 P.3d 576, 580 (Colo. App. 2004) (reversing trial court's decision not to award costs and fees to the prevailing party despite existence of contract fee-shifting provision). Additionally, Colorado public policy mandates that any contractual fee-shifting provision be limited to "reasonable" attorney fees. *Cf. S. Colo. Orthopaedic Clinic Sports*

*Med. & Arthritis Surgeons, P.C. v. Weinstein*, 343 P.3d 1044, 1048, 1047 (Colo. App. 2014) (holding that a "starkly absolute fee-shifting provision that does not impose a reasonableness requirement on the amount of attorney fees and costs awarded contravenes public policy"); *Klein*, 405 P.3d at 475 (Colo. App. 2017) (citing *Weinstein* with approval). When a contract provides for reasonable attorney fees, the burden is on the party seeking attorney fees to show that a fee award is reasonable. *See, e.g.*, *Gustafson v. Am. Fam. Mut. Ins. Co.*, No. 11-cv-01303-PAB-MEH, 2012 WL 5904301, at *5 (D. Colo. Nov. 26, 2012) (stating that, where a contract provides for "reasonable" attorney fees, the burden is on the party seeking fees to show reasonableness) (citations omitted); *United States ex rel. Sun Constr. Co., Inc. v. Torix Gen. Contractors, LLC*, No. 07-cv-01355-LTB-MJW, 2011 WL 3648287, at *2 (D. Colo. Aug. 18, 2011) (same).

### III. Analysis

#### A.    Attorney Fees and Costs

Here, the parties do not dispute the MOU's existence, its validity, or the Court's power to enforce it while this litigation remains pending. *See, e.g.*, *Response to Motion to Enforce* [#134] at 7 (recognizing the Court's "substantial discretion in managing discovery matters, which can include unconventional procedures in unique circumstances if deemed necessary for the fairness and effectiveness of the proceedings" and agreeing that "the [Defendants] will honor any Order this Court enters" related to the MOU, "including an order to proceed with the Audit").

Therefore, to resolve Plaintiff's Motion [#143], the Court must answer three questions: (1) whether Defendants breached or failed to comply with the MOU, as Mr. Horton found in September 2023; (2) whether the MOU provides for attorney fees in the

12

event of breach or non-compliance; and (3) whether Plaintiff has shown that its requested attorney fees are reasonable.

1.    **Breach**

Here, the parties do not dispute that Mr. Horton found Defendants were in non-compliance with MOU and that their failure to provide requested documents significantly delayed the 2023 audit, though Defendants assert that they "made a good faith effort to get Mr. Horton each of the documents he requested." *See Non-Compliance Letter* [#120-2] at 4 (calling "the end to this process due to non-compliance" based on Defendants' failure to produce requested documents); *but see Response* [#149] at 5.

Under the MOU, Mr. Horton was entitled to request "additional documents, records, and electronically stored information as he deems fit," and if he "cannot obtain the requested documents and deems them to be needed, he shall inform by email all Parties['] counsel and if warranted halt or stop the Audit." *MOU* [#105-2] at 3-4, §§ IV.1, 3. The MOU provided that "[a]ny material delay to Mr. Horton's services due to unpaid fees or failing to produce requested documents shall be deemed a material breach of this MOU." *Id.* at 4, § IV.9. If Mr. Horton "[found] that he could not properly complete the Audit[,] Plaintiffs shall have the right to file an appropriate motion before the court seeking compliance, terminating the Audit, seeking specific performance, as well as seeking that the $10,000.00 placed in escrow . . . be forthwith paid over to [Plaintiff and its counsel]." *Id.*, § IV.13. Moreover, Defendants "agree[d] not to challenge this tendering and release of funds in the event of such a breach if represented by the auditor." *Id.*

Taken as a whole, these provisions unambiguously vested Mr. Horton with broad discretion over which documents he might deem necessary and empowered him to stop

the audit if he could not obtain those documents, following notice to both parties. Mr. Horton was empowered to determine whether Defendants were non-compliant or in breach for purposes of the penalty provision, and the MOU provided that any material delay in Mr. Horton's services would constitute a material breach. Whether Defendants acted in good faith or bad faith has nothing to do with whether they breached the MOU. Defendants' non-compliance or breach hinged on whether they provided Mr. Horton with requested documents and whether their failure to do so resulted in "material delay". *Id.*, § IV.9.

Ultimately, on September 25, 2023, Mr. Horton exercised his prerogative and informed both parties that he had found Defendants non-compliant and that he would halt the audit. *See Non-Compliance Letter* [#120-2] at 4. He provided several examples of conversations and requests that went unanswered. *Id.* Mr. Horton's Non-Compliance Letter [#120-2] plainly establishes that Defendants breached the MOU: he determined that their failure to produce requested documents had materially delayed resolution of the audit, and that determination was his to make. *Cf. MOU* [#105-2] at 4, § IV.13 (stating that Defendants "agree[d] not to challenge [the] tendering and release of funds in the event of such a breach if represented by the auditor"). Moreover, as Defendants acknowledge, the Court has also found that they breached the MOU, in ordering them to tender $10,000 to the Court's Registry. *See Response* [#149] at 3 (stating that "[o]n June 12, 2024, the Court determined that [Defendants] breached the MOU and ordered that [they] deposit $10,000 in the Court's registry, as required by [§ IV,] ¶ 13 of the MOU"). The Court need not and therefore does not make any additional finding that the Defendants' conduct was done willfully or in bad faith or was otherwise sanctionable. In

14

2023, Defendants plainly breached the MOU by failing to provide Mr. Horton with requested documents.

### 2.    Attorney Fees Provision

Having found that Defendants breached the MOU, the Court considers whether that breach entitles Plaintiff to attorney fees. Defendants argue that "[t]hough the MOU permits Plaintiff to file a motion for sanctions" in event of breach or non-compliance, "it does not mandate that the Court award any such sanctions." *Response* [#149] at 9-10. They add that "[h]ad the parties intended that any breach of the MOU, of any nature, would result in an award of attorneys' fees to the non-breaching party, they could have contracted for the same and included a provision *requiring* the Court to award fees in the event of a breach." *Id.* at 10. Because they did not act in bad faith, they argue that fees are unwarranted. For at least three reasons, the Court is unpersuaded by Defendants' attempt to overcomplicate this straightforward provision. *Cf. Butler v. Lembeck*, 182 P.3d 1185, 1189 (Colo. App. 2007) (stating that courts "interpret fee-shifting provisions in a contract in a common sense manner") (citing *Agritrack, Inc. v. DeJohn Housemoving, Inc.*, 25 P.3d 1187, 1192 (Colo. 2001) (rejecting "an overly technical reading of a fairly simple [fee-shifting] provision")).

First, the MOU was not intended to *require* the Court to do anything. The MOU unmistakably articulates in capitalized text that the parties understand that neither they nor their lawyers have any control over the outcome, including nature and scope, of any judicial decision. *MOU* [#105-2] at 5, § V.A. However, the provision "permit[ting] Plaintiff to file a motion for sanctions" seeking attorney fees in event of breach would be superfluous if it did not also permit the Court to grant those fees. *Cf. People ex rel. Rein*

15

*v. Jacobs*, 465 P.3d 1, 11 (Colo. 2020) ("In construing a contract, [the court] interpret[s] the contract in its entirety, seeking to harmonize and give effect to all of its provisions so that none will be rendered meaningless.") (citation omitted).

Additionally, the MOU clearly expresses the parties' intent for attorney fees to be available in the event of a breach that resulted in delay or further litigation. Three provisions of the MOU point to this conclusion. First, the parties agreed that "[a]ny material delay to Mr. Horton's services due to unpaid fees or failing to produce requested documents shall be deemed a material breach of this MOU." *MOU* [#105-2] at 4, § IV.9. Not just a breach but a *material* breach. Second, the parties agreed the party alleging breach or non-compliance may bring a motion that seeks attorney fees and costs. *Id.* at 5, § IV.15. Third, the parties agreed that "[i]n the event litigation arises out of or stemming from this Agreement, the Prevailing Party shall be entitled to an award of reasonable attorney fees and costs." *Id.* at 6, § V.G. Defendants' reading of the MOU as authorizing attorney fees only where the breach "[was] done in bad faith, or [was] intentionally dilatory or obstructive," *Response* [#149] at 10, finds no support in the "material breach" provision, the two attorney fee provisions, or elsewhere in the MOU.

Therefore, the Court finds that the MOU unambiguously allows Plaintiff to move for (and the Court to award) attorney fees in the event of a material breach of the MOU. Here, Mr. Horton found, and the Court agrees, that Defendants' failure to produce requested documents in 2023 caused material delay in his ability to complete the audit. *See Non-Compliance Letter* [#120-2] at 4. This was a "material breach" of the MOU, which allows for "an award of attorney fees and costs." *MOU* [#105-2], §§ IV.9, 15.

Finally, Defendants' failure to comply with the MOU plainly delayed resolution of this lawsuit and led to additional litigation in the form of motions practice—Plaintiff had to file a Motion to Enforce the MOU [#120]. The MOU plainly provides for attorney fees "[i]n the event litigation arises out of or stemming from this Agreement." *Id.* at 6, § V.G. The Court finds that reasonable attorney fees are warranted arising from Defendants' breach of the MOU in 2023, pursuant to §§ IV.13 and V.G.

### 3.    Reasonableness

Having found that attorney fees are warranted pursuant to § IV.15 of the MOU, the Court must consider what is reasonable. Plaintiff seeks $96,546.38 in fees and $1,695.77 in costs for "counsel's billing for the months from November 2022 through April 2024." *Motion* [#143] at 6, ¶ 24. It argues that "all such fees are directly related to the discovery abuses of the Defendants" and that there is a "reasonable nexus to the monies spent." *Id.* Defendants argue that Plaintiff's submitted invoices are "woefully deficient to serve as the basis for a demand of $98,242.15 in attorneys' fees and costs" because they "*mostly include* time entries with no rational relationship" to the MOU or Defendants' alleged breaches thereof. *Response* [#149] at 12 (emphasis in original).

The Court agrees with Defendants. Plaintiff cannot reasonably assert that every hour of time billed on this case (and its companion case) since November 2022 reasonably arose from Defendants' alleged breach in September 2023. The Court also notes several obvious problems with Plaintiff's submitted billing records that must be addressed before the Court can determine a reasonable fee.

First, Plaintiff included some bills for work that was performed months or years prior. For example, in the February 2023 billing period—*which predates Defendants'*

*breach by seven months*—Plaintiff's counsel billed 1.75 hours for "Legal research and prepared and filed memorandum on the issue of redactions to ECF No.'s 10-2 and 10-3 in accordance with the Court's June 8, 2020, Order (ECF 31)." *See Billing Entries* [#143-3] at 15. However, Plaintiff responded to the Minute Order [#31] just two days later, on June 10, 2020. *See Reply* [#32]. The work identified in this time entry predated the MOU's execution by nearly *three years*. The same billing period included 4 hours for "Legal Research, prepared and filed our Reply in Opposition to [D.69] Defendants/Counterclaimants/Third-Party Plaintiffs' ("LabX Parties") Response to Movants' [D.58] Motion to Extend Discovery Cutoff, Dispositive Motions, and Expert Witness Disclosure and Rebuttal Expert Witness Disclosure Deadline[s.]" *See Billing Entries* [#143-3] at 14. Plaintiff filed the relevant reply brief on April 26, 2022—*one year before the MOU was executed. See Reply* [#71]. Of course, time spent on briefs filed in 2020 and 2022 cannot be reasonably attributed to Defendants' breach of the MOU in September 2023.

Second, Plaintiff argues that it is entitled to all fees and costs incurred "from November 2022 through April 2024" but it inexplicably, and without any acknowledgement, also attached October 2022 billing entries totaling $10,327.50. *See Billing Entries* [#143-3] at 3-4. This month of billing falls outside Plaintiff's already expansive time period and should not be included.

Third, Plaintiff has redacted several billing entries, which prevents the Court (or Defendants) from knowing what they are for, whether they are reasonable, and whether they are related to Defendants' breach of the MOU. *See, e.g.*, *id.* at 13 (fully redacted entry for 1.5 hours), 15 (fully redacted entry for 1.5 hours), 40 (fully redacted entry for

18

11.25 hours). In a particularly egregious example, Plaintiff's counsel block-billed 42.10 hours in January 2023 for a partially redacted entry that states "[REDACTED] (Spent week doing so for 3 hours per day. In person. 18 hours.) Helped formulate trial arguments with expert as to issues of liability and narrow damages. (7 hours). [REDACTED] Sourced and compared with bate stamped documents (8 hours)." *Id.* at 12. The Court cannot determine what counsel spent these 42 hours doing, whether it was reasonable to spend that much time, or whether those activities had anything to do with Defendants' breach of the MOU.

Plaintiff claims that, between October 2022 and April 2024, counsel spent over 213 hours on this case. *See id.* at 2. That may be so, but not all that time is reasonably attributable to Defendants' breach of the MOU. For example, "basic princip[le]s of linear time" prevent the Court from attributing time spent between October 2022 and April 2023 selecting an auditor in this case to Defendants' failure to provide Mr. Horton with documents from May 2023 through September 2023. *Cordova v. Aragon*, 569 F.3d 1183, 1194 (10th Cir. 2009) (applying basic principles to question how conduct that occurred after an alleged violation caused that violation). Given these concerns, the Court finds that Plaintiff has not met its burden of showing that the requested $98,242 in costs and fees are reasonable. Given the numerous glaring issues with Plaintiff's submitted billing records, the Court lacks sufficient information to conduct its own independent review.

Therefore, Plaintiff's Motion [#143] is **granted in part**. The Court finds that Plaintiff is entitled to reasonable attorney fees attributable to Defendants' breach of the MOU. However, the Motion [#143] is **denied without prejudice** in all other respects related to the request for fees and costs. The Court will not grant any fees at this time because

19

Plaintiff has not supported and substantiated its request. The Court encourages Plaintiff to address the deficiencies it has discussed here, namely: (1) inclusion of more than 100 billed hours that predate both the Engagement Letter and the MOU; (2) the inclusion of October 2022 billing, which fell outside the already broad scope of time Plaintiff claims; (3) redactions that make it impossible for the Court or Defendants to know what work was performed; and (4) attempts to attribute all costs of litigation after September 25, 2023, to the breach of the MOU, no matter how attenuated.

If Plaintiff would like the Court to award attorney fees, it must file a renewed motion, after conferring with Defendants, that identifies and substantiates only those costs and fees reasonably attributable to Defendants' breach of the MOU. By way of example, this may include any time and costs associated with moving to enforce the MOU and participating at the June 12, 2024 Status Conference. Defendants will be permitted to respond, to the extent they wish to challenge the reasonableness or amount of any fees. Because the Court finds that Plaintiff should be awarded its fees and costs, the parties need not (and should not) brief the issue of whether fees and costs should be awarded.

## B.    Payment of Funds from Court Registry

Finally, the Court addresses Plaintiff's request for payment of $5,000 from the funds deposited into the Court's Registry. *See Motion* [#143] at 7.[4]

As already discussed, Defendants agreed to pay $10,000 in trust (either to the Clerk of Court or to either party's attorney's trust account) "should the auditor's report find

---

[4] Plaintiff in the companion case, No. 20-cv-03514, has also requested payment of $5,000 from the funds deposited into the Court's Registry. *See Motion for Sanctions* [#114] at 7, Case No. 20-cv-03514. Thus, Plaintiffs in both cases seek a total of $10,000 from the Court's Registry.

that he could not properly complete the Audit." *MOU* [#105-2] § IV.13. The MOU permits Plaintiff in this case and the plaintiff in the companion case "to file an appropriate motion before the court . . . seeking that the $10,000.00 placed in escrow pursuant to the terms of this paragraph so that they shall be forthwith paid over to [Plaintiffs in both cases and their counsel]." *Id*. Further, Defendants agreed "not to challenge this tendering and release of funds in the event of such a breach if represented by the auditor." *Id*.

At the June 12, 2024 Status Conference, the Court ordered Plaintiff to deposit $10,000 (total for this case and the companion case, No. 20-cv-03514-DDD-KAS) into the Court's Registry, as contemplated by the MOU § IV.13, after finding that Defendants breached the MOU. *Courtroom Minutes* [#141] at 1. In a July 22, 2024 Order [#148], the Court ordered transfer of the $10,000 from the Court's Registry to Mr. Horton as payment of his retainer so he could resume and complete the audit and in order to facilitate the "ultimate resolution of this case and the [companion case.]" *Order* [#148] at 3-4; *see also id*. at 2 (noting that the MOU, § IV.7 requires Defendants to pay Mr. Horton's retainer and fees). The Court further stated that it "will require LabX Parties to replenish the funds in the Court's Registry by a date certain" because "(a) [those monies were] originally placed in the Court's Registry pursuant to § IV(13) of the MOU and (b) the Court has made no findings as to how those MOU-required funds should ultimately be allocated[.]" *Id*.

On September 23, 2024, Defendants deposited another $10,000 into the Court's Registry. *See Receipt* [#153]. On October 15, 2024, during a status conference, the Court and the parties discussed Mr. Horton's latest invoice for time spent on the audit and whether Defendants' recently deposited funds should be used to pay Mr. Horton. *See Courtroom Minutes* [#154] at 1; *see also Minute Order* [#155] at 2 (noting that Mr. Horton

had exhausted $9,600 of the $10,000 retainer and he requested an additional $5,000 to complete the audit). Plaintiff argued that the monies in the Court Registry should be paid to Plaintiff as sanctions for Defendants' breach of the MOU. *See Minute Order* [#155] at 2. Defendants stated they would prefer to have the funds withdrawn from the Registry. *Id*. Ultimately, the Court ordered that $5,000 be taken from the Court's Registry to pay Mr. Horton. *Courtroom Minutes* [#154] at 2; *see also Minute Order* [#155] at 2 (ordering withdrawal of $5,000).

Mr. Horton completed his audit, and his final invoice reflected an additional $5,000 in fees. *See Final Billing Record* [#173].[5] On February 10, 2025, the Court notified the parties of Mr. Horton's final billing, the amount of remaining funds in the Court Registry, and that $5,000 will be drawn from the Registry to pay Mr. Horton for the audit's completion. *Minute Order* [#172] at 1-2. Additionally, the Court set a deadline for Defendants to object to the disbursement of funds to Mr. Horton, *see id*. at 2, and the deadline passed without any objections filed. Therefore, on February 24, 2025, the Court ordered that $5,000 be withdrawn from the Registry and paid to Mr. Horton, leaving any accrued interest.[6] *Minute Order* [#175]. As of the date of this Order, the Registry contains $141.86 in interest. In total, Defendants paid $20,000 into the Court Registry, which funds were used to achieve the audit's completion, pursuant to the MOU's requirement that Defendants pay Mr. Horton's retainer and fees. *See MOU* [#105-2], § IV.7 ("Defendants

---

[5] Pursuant to court order, the Final Billing Record [#173] is filed under Level 1 restriction, which limits access to the parties and the Court. *See Minute Order* [#172].

[6] As of February 10, 2025, the Registry contained $132.48 in accrued interest. *See Minute Order* [#172] at 1.

agree to timely remit payment to Mr. Horton, including payment of the retainer and any applicable retainer refill requests").

Pursuant to the MOU [#105-2] § IV.13, funds are placed in the Court Registry "for the equal benefit of each Plaintiff in the two separate cases" and "are considered a penalty" for Defendants' non-compliance with the audit and breach of the MOU. *MOU* [#105-2], § IV.13. As already discussed with respect to attorney fees, however, the MOU does not require the Court to order payment of any Registry funds to Plaintiff. *See id*. (contemplating Plaintiff's filing a motion for payment of those funds to it); *id*. § V.A (acknowledging the parties have no control over whether the court grants the requested relief).

Moreover, penalty provisions are unenforceable on grounds of public policy because "[t]he central objective behind the system of contract remedies is compensatory, not punitive," and "[p]unishment of a promisor for having broken his promise has no justification on either economic or other grounds[.]" RESTATEMENT (SECOND) OF CONTS. § 356, cmt. a (AM. L. INST. 1981) (Oct. 2024 update); *cf. Rohauer v. Little*, 736 P.2d 403, 410 (Colo. 1987) (noting that stipulated liquidated damages that are "so disproportionate to any possible loss" constitute a penalty); *DBA Enters, Inc. v. Findlay*, 923 P.2d 298, 303 (Colo. App. 1996) (stating, "a liquidated damages provision which amounts to a penalty is not enforceable"); *Clinger v. Hartshorn*, 911 P.2d 709, 711 (Colo. App. 1996) (stating, "a contract provision which purports to award a non-breaching party an asset valued at substantially more than any actual damage may represent an unenforceable penalty clause"). However, where a provision is unenforceable as a penalty, a court may award actual damages. *See Yerton v. Bowden*, 762 P.2d 786, 788 (Colo. App. 1988) (remanding

for the trial court to determine actual damages for breach of contract if it determines the liquidated damages provision is unenforceable as a penalty).

Here, the Court has already granted Plaintiff's Motion [#143] to the extent it seeks recoupment of fees and costs—*i.e.*, actual damages—incurred as a result of Defendants' breach of the MOU. The request of Plaintiff in this case and of the plaintiff in the companion case for a combined total of $10,000 is on top of any fee and cost award and is pursuant to the MOU's expressly identified "penalty provision." This requested sum exceeds actual damages and contradicts the compensatory objectives that the system of contract remedies provides. Therefore, the Motion [#143] is **denied in part** to the extent it seeks payment of funds from the Court's Registry pursuant to the MOU's "penalty" provision.

## IV. Conclusion

Based on the foregoing,

IT IS HEREBY **ORDERED** that the Motion [#143] is **GRANTED IN PART** to the extent that the Court finds Plaintiff is entitled to attorney fees and costs resulting from Defendants' breach of the MOU, pursuant to § IV.15 of the MOU. The Motion [#143] is **DENIED WITHOUT PREJUDICE** in all other respects related to the request for fees and costs. The Motion [#143] is **DENIED IN PART** to the extent it seeks payment of funds from the Court's Registry pursuant to the Memorandum of Understanding's "penalty" provision.

IT IS FURTHER **ORDERED** that, on or before **March 26, 2025**, after conferring with Defendants, Plaintiff shall file a Motion for Attorney Fees along with amended billing entries that address the deficiencies identified herein. On or before **April 9, 2025**,

Defendants may file a response challenging the amount or reasonableness of Plaintiff's requested fees. No reply brief will be permitted.

IT IS FURTHER **ORDERED** that the Court's Financial Services shall remit all accrued interest within the Registry to Nadav Aschner, Esq. of The Rodman Law Group, LLC, as counsel for Defendants in this case and the companion case, *Rifle Onion Co. v. Hellman*, No. 20-cv-03514-DDD-KAS, per instructions that Mr. Aschner shall separately provide Financial Services.

IT IS FURTHER **ORDERED** that by **March 19, 2025**, Mr. Aschner shall provide instructions to Financial Services for remittance of funds.

Dated: March 12, 2025                    BY THE COURT:

                                        Kathryn A. Starnella
                                        United States Magistrate Judge